141 T.C. No. 19

UNITED STATES TAX COURT

ANDREW WAYNE ROBERTS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23405-10.                    Filed December 30, 2013.

During 2008 P's former wife (W) submitted withdrawal requests bearing what purported to be P's signatures to two companies administering IRAs P owned. The requests were prepared and submitted without P's knowledge, and P's signatures on the requests were forged. The companies processed distributions from P's IRAs in accordance with the requests and issued checks made payable to P. W received and endorsed the checks by forging P's signatures, deposited the checks into a joint account that only she used, and used the proceeds from the checks for her personal benefit. P did not know about the withdrawals until sometime in 2009 when he received Forms 1099-R with respect to the purported distributions, and he did not learn of W's involvement in cashing the distribution checks and using the proceeds until the divorce proceeding in 2009. W electronically filed an income tax return for P for 2008 that she prepared using a filing status of single. She did not report the IRA withdrawals as income on P's return. R determined that P is the distributee who must include the withdrawals in income pursuant to

I.R.C. sec. 408(d) and that P is liable for the I.R.C. sec. 72(t) additional tax on early distributions from qualified retirement plans. R also determined that P is liable for an accuracy-related penalty under I.R.C. sec. 6662(a) due to a substantial understatement of income tax.

Held: P is not a "payee" or "distributee" within the meaning of I.R.C. sec. 408(d)(1).

Held, further, P is not liable for the I.R.C. sec. 72(t) additional tax on early distributions from qualified retirement plans.

Held, further, P's proper filing status for 2008 is married filing separately.

Held, further, P is liable for the accuracy-related penalty under I.R.C. sec. 6662(a) to the extent the adjustments P conceded result in a substantial understatement of income tax.

John A. Clynch and Scott A. Schumacher, for petitioner.

Connor J. Moran and Dean H. Wakayama, for respondent.

MARVEL, Judge: Respondent determined a deficiency in petitioner's 2008 Federal income tax of $13,783 and an accuracy-related penalty of $3,357 under section 6662(a).[1] In an amendment to answer respondent asserted an increased

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are

(continued...)

deficiency of $14,177 and an increased accuracy-related penalty of $3,435. After concessions,[2] the issues for decision are: (1) whether petitioner must include in taxable income for 2008 withdrawals from his individual retirement accounts (IRAs) of $37,020 that his former wife took without his knowledge or permission and that he did not receive directly or indirectly during 2008; (2) if so, whether he is liable for the 10% additional tax on early distributions under section 72(t); (3) whether petitioner's proper filing status for 2008 is married filing separately; and (4) whether petitioner is liable for the section 6662(a) penalty.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Petitioner resided in the State of Washington when he petitioned this Court.

I.  Background

In 1990 petitioner married Cristie Smith (Ms. Smith). During 2008 petitioner was an employee of the U.S. Air Force, and Ms. Smith was an employee

---

[1](...continued)
rounded to the nearest dollar.

[2]Petitioner concedes that he received wage income of $39,232 and interest income of $74 for 2008.

of Bethel Transportation. Petitioner and Ms. Smith separated for a period in 2008, permanently separated in January 2009, and were divorced in March 2010.

## II. Financial Accounts

Petitioner and Ms. Smith maintained joint checking accounts at Washington Mutual and Harborstone Federal Credit Union (Harborstone).[3] Although the accounts were titled in joint name, petitioner exclusively used the Harborstone account during and after 2008 and Ms. Smith exclusively used the Washington Mutual account. Petitioner did not have a checkbook for, write checks on, or make withdrawals from the Washington Mutual account, and he did not receive or review the bank statements for the Washington Mutual account during 2008. Petitioner did not know about, authorize, or benefit from any deposits into, or withdrawals from, the Washington Mutual account during 2008 and after.

## III. IRA Withdrawals

### A. IRA Accounts

Petitioner owned IRA accounts at AIG SunAmerica Life Insurance Co. (SunAmerica), and ING.

---

[3]The Washington Mutual account was later transferred to Chase Bank. We refer to the Washington Mutual/Chase Bank account as the Washington Mutual account.

B.    <u>SunAmerica IRA</u>

In September 2008 SunAmerica received a request purportedly from petitioner to withdraw $9,000 from his SunAmerica IRA.  Petitioner did not make the request, and he did not authorize anyone else to make it on his behalf.  SunAmerica received the withdrawal request from a fax machine at Bethel Transportation.  Petitioner did not ask Ms. Smith or anyone else at Bethel Transportation to fax the withdrawal request to SunAmerica.

The withdrawal request is signed "Andy Roberts".  The signature is not petitioner's signature and was forged.

SunAmerica issued a check made payable to petitioner from his SunAmerica IRA pursuant to the faxed withdrawal request.  The SunAmerica check was endorsed "Andy Roberts" and was deposited into the Washington Mutual account.  Petitioner, however, did not endorse the SunAmerica check, and he did not authorize anyone to sign the check on his behalf.  The endorsement on the SunAmerica check is not petitioner's signature and was forged.

### C.    ING IRA

Petitioner did not make any request for any distribution from his ING IRA account during 2008.[4] Nevertheless, in November 2008 ING issued a $9,000 check made payable to petitioner from his ING IRA. In December 2008 ING issued another check, for $18,980, made payable to petitioner from his ING IRA. Each ING check was endorsed "Andy Roberts" and was deposited into the Washington Mutual account. Petitioner, however, did not endorse either of the ING checks, and he did not authorize anyone to sign the checks on his behalf. Petitioner's signatures on the checks were forged.

### IV.    Use of Misappropriated IRA Funds

Petitioner did not receive the ING and SunAmerica IRA distribution checks during 2008, and he was unaware that the checks had been issued. Petitioner also was unaware that the IRA distribution checks had been deposited into the Washington Mutual account.[5]

---

[4]Withdrawal requests related to the ING distributions are not part of the record. We find credible petitioner's testimony that he was unaware of the ING distributions until sometime in 2009 and infer from the record that he did not request any distribution from his ING IRA account during 2008.

[5]Respondent contends that petitioner directly benefited from the IRA withdrawals in 2008. We disagree. Petitioner and Ms. Smith shared expenses during their marriage. Petitioner deposited his paycheck into the Harborstone

(continued...)

We infer from the record and find that Ms. Smith or someone on her behalf forged petitioner's signature on each of the distribution requests and the endorsements on the checks, and she deposited the checks into the Washington Mutual account that only she used. In the months following the IRA withdrawals Ms. Smith made large expenditures from the Washington Mutual account to, among other things,[6] establish a separate household from petitioner.[7] From mid-November 2008 through mid-January 2009 Ms. Smith wrote checks and made

---

[5](...continued)
account and made the mortgage loan and car payments. Petitioner also paid bills such as the cable, electric, and insurance bills. Ms. Smith deposited her paycheck into the Washington Mutual account and used that account to pay the phone bill, buy groceries, and purchase clothing for the children.

Nothing in the record suggests that the IRA withdrawals were used to pay any expenses that were petitioner's responsibility. Instead, the record shows that Ms. Smith used the IRA withdrawals to make large purchases at retail stores, such as Old Cannery Furniture; Bed, Bath & Beyond; Ikea; and Target; to take a trip to Disneyland; and to set up a household separate from petitioner's. These expenditures were for the sole benefit of Ms. Smith and were made without petitioner's knowledge. We do not find credible any testimony by Ms. Smith to the contrary.

[6]Ms. Smith frequently overdrew her Washington Mutual account during 2008. The Washington Mutual account bank records show overdraft charges of $3,522 for 2008.

[7]In one instance, Ms. Smith made a withdrawal of $17,345 from the Washington Mutual account for the purpose of setting up her separate household.

withdrawals from the Washington Mutual account totaling $41,257; her payroll deposits from Bethel Transportation for this period totaled only $3,950.[8]

Petitioner first learned of the unauthorized withdrawals from his IRA accounts when SunAmerica and ING issued to him Forms 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., in 2009. When he received the first Form 1099-R, petitioner thought that he had been the victim of a theft, but he had no reason to believe at the time that Ms. Smith was involved. By the time of his divorce proceeding in 2009, however, petitioner had learned that Ms. Smith had deposited the checks into the Washington Mutual account and had used the proceeds for her benefit.[9] During the divorce proceeding petitioner advised the trial court that Ms. Smith had taken and used the funds from his IRA accounts without his knowledge or permission. In 2010 the division of assets in the trial court's decree of dissolution

---

[8]Beginning with the Washington Mutual statement for the period of December 12, 2008, through January 14, 2009, Washington Mutual lists Ms. Smith's separate address in Puyallup, Washington, as the account holders' address. Washington Mutual bank statements for periods before December 12, 2008, list petitioner and Ms. Smith's address in Spanaway, Washington, as the account holders' address.

[9]Ms. Smith filed for divorce from petitioner on February 18, 2009. The Pierce County, Washington, Superior Court entered a decree of dissolution of petitioner and Ms. Smith's marriage on March 26, 2010.

took into account that Ms. Smith had withdrawn funds from petitioner's IRA accounts.[10]

## V.     Petitioner's Tax Reporting and Notice of Deficiency

For each year of their marriage until 2008, Ms. Smith prepared and filed a joint income tax return for petitioner and herself. Sometime before April 2009, petitioner, although separated from Ms. Smith, discussed with her the preparation and filing of a joint income tax return for 2008, and he understood from that conversation that he and Ms. Smith would still file a joint return. He gave his tax information to her so that she could prepare the 2008 joint return. However, without telling him, Ms. Smith prepared and filed separate returns for herself and petitioner. Ms. Smith prepared her return for 2008 using married filing separate filing status, but she prepared petitioner's return using single filing status. On petitioner's return Ms. Smith underreported petitioner's wage income by $3,000, claimed an overstated credit for withheld tax (the credit was overstated by $3,000), and omitted $74 of interest income. As prepared, petitioner's return claimed that

---

[10]Although the parties jointly stipulate that the "decree of dissolution was made taking into account the fact that funds, including funds from the SunAmerica IRA and the ING IRA had allegedly already been withdrawn by petitioner's wife", we do not know what the stipulation means, and we cannot conclude from the stipulation as drafted that petitioner received any economic benefit in the form of an adjustment to the property that Ms. Smith was awarded in the divorce proceeding.

he was entitled to a refund of a $3,357 overpayment, which was electronically deposited into Ms. Smith's Washington Mutual account.[11]

Ms. Smith filed petitioner's return electronically on April 13, 2009.  She did not show the return to petitioner or give him a copy of the return, despite his asking for one.  Thus, petitioner did not sign or see his 2008 tax return before its filing.  Ms. Smith did not report the withdrawals from the SunAmerica and ING IRAs as income on either the return she prepared for petitioner or her return.[12]

On August 2, 2010, respondent issued to petitioner a notice of deficiency. In the notice of deficiency respondent determined that petitioner had failed to report income of $37,020 attributable to the IRA withdrawals and adjusted the resulting tax deficiency by the amount of the overstated withholding credit. Respondent increased the deficiency in an amendment to answer to account for the incorrect filing status used on petitioner's 2008 return.

---

[11]The actual refund deposit to the Washington Mutual account from the Department of the Treasury was $3,092.  We are unable to resolve the discrepancy between the claimed refund amount and the actual refund amount from the information in the record.

[12]Respondent issued a tax refund of $3,092 and deposited the refund electronically into the Washington Mutual account on April 24, 2009.  On the same day as the refund deposit Ms. Smith withdrew $3,000 from the Washington Mutual account.  Petitioner was unaware at the time that respondent had issued a refund with respect to his 2008 return, and he did not receive it or benefit from it.

OPINION

I.      Burden of Proof

Ordinarily, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The burden of proof shifts to the Commissioner, however, if the taxpayer produces credible evidence with respect to an issue, the taxpayer complied with the substantiation requirements, and the taxpayer cooperated with the Secretary[13] regarding all reasonable requests for information.  Sec. 7491(a); see also Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).  Further, if the Commissioner raises a new issue or seeks an increase in the deficiency, the Commissioner bears the burden of proof as to the new issue or increased deficiency.  See Rule 142(a)(1).

The U.S. Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie absent a stipulation to the contrary, see sec. 7482(b)(1)(A), (2), has

_____

[13]The term "Secretary" means "the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B), and the term "or his delegate" means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context", sec. 7701(a)(12)(A)(i).

held that for the presumption of correctness to attach to the notice of deficiency in unreported income cases, the Commissioner must establish some evidentiary foundation connecting the taxpayer with the income-producing activity, see Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977), or demonstrating that the taxpayer actually received unreported income, see Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982). If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer, who must establish by a preponderance of the evidence that the unreported income adjustment was arbitrary or erroneous. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97.

The record contains copies of the Commissioner's computer records that reflect receipt of Forms 1099-R showing taxable distributions of $37,020 to petitioner, and the parties do not dispute that the distribution checks were issued and made payable to petitioner. Because respondent has introduced evidence that petitioner received unreported IRA distributions during 2008, the presumption of correctness attaches to respondent's determination in the notice of deficiency.

Petitioner bears the burden of proof with respect to that determination.[14] See Rule 142(a); Hardy v. Commissioner, 181 F.3d at 1004. Respondent, however, bears the burden of proof with respect to the increased deficiency attributable to the allegedly erroneous filing status. See Rule 142(a)(1).

II.    Analysis

Section 408(d)(1) provides that any amount paid or distributed out of an IRA is included in the gross income of the payee or distributee as provided under section 72. Generally, the payee or distributee of an IRA is the participant or beneficiary who is eligible to receive funds from the IRA. Bunney v. Commissioner, 114 T.C. 259, 262 (2000) (citing Darby v. Commissioner, 97 T.C. 51, 58 (1991)). However, this is not always the case. The taxable distributee under section 408(d)(1) may be someone other than the recipient or purported recipient eligible to receive funds from the IRA. Indeed, we have previously rejected the contention that the recipient of an IRA distribution is automatically the taxable distributee. See Bunney v. Commissioner, 114 T.C. at 262.

Neither the Code nor applicable regulations define the terms "payee" or "distributee" or provide specific guidance on when an amount is considered to

---

[14]Petitioner does not assert nor has he proven that he is entitled to a shift in the burden of proof under sec. 7491(a).

have been paid or distributed to a payee or distributee under section 408(d)(1).

This is not surprising because under most circumstances the payee or distributee is easily identifiable and the fact of the distribution can normally be ascertained without difficulty. In this case, however, we find that the distribution requests were forged, and the endorsements on the checks that were issued pursuant to the forged requests were also forged. Petitioner, the purported payee on the checks, did not know of or authorize the requests, and he did not receive or cash the checks. These facts present an issue of first impression under section 408(d)(1)-- whether IRA withdrawals made pursuant to forged withdrawal requests that are not received by the purported distributee or used by the purported distributee for his or her economic benefit are distributions includible in the gross income of the purported distributee under section 408(d). Common sense dictates that the answer must be no, and our findings of fact and analysis support that answer.

A.    Distributions From Petitioner's IRAs

Petitioner credibly testified that he did not sign the SunAmerica withdrawal request, endorse the SunAmerica IRA distribution check, endorse the ING IRA distribution checks, or authorize any person to do so on his behalf. Indeed, petitioner credibly testified that he did not learn of either the SunAmerica or ING IRA distributions until he received the Forms 1099-R sometime in 2009.

Petitioner further testified that he signs his name "Andrew W. Roberts" and dates his signature with the day first, then the month abbreviated, and finally the year. He formed the habit of signing and dating his name in this manner during his time in the military.

The IRA distribution checks were all endorsed "Andy Roberts", and the SunAmerica withdrawal request was not dated in petitioner's customary format. The SunAmerica withdrawal request was faxed from Ms. Smith's place of employment, and all of the IRA checks were deposited into the bank account used by Ms. Smith. We find that Ms. Smith or someone on her behalf, and not petitioner, signed the withdrawal requests and the checks, and that the signatures were made without petitioner's authorization. In effect, Ms. Smith perpetrated a fraud on, and stole from, the companies administering petitioner's IRAs.

Petitioner credibly testified that he did not receive the IRA checks, and the record shows that the checks were deposited into an account that was joint in name only; the account was exclusively used by Ms. Smith. Petitioner did not have a checkbook for the Washington Mutual account, did not make any withdrawals from the Washington Mutual account, and was generally unaware of the use of the Washington Mutual account. Ms. Smith, however, routinely used the Washington Mutual account for her personal expenditures, which were often excessive and

which generated numerous overdraft charges.  We do not find credible Ms.

Smith's testimony[15] that she was unaware of the source of the deposits made to the

Washington Mutual account when, in many instances, the deposits dwarfed the

account's balance at the time.[16]  Ms. Smith's testimony is particularly unbelievable

in the light of the evidence that she made large cash withdrawals and purchases in

close proximity to the deposits of the IRA checks.  In short, Ms. Smith, and not

petitioner, received, spent, and benefited from the IRA distributions.

---

[15]Respondent filed a motion in limine to exclude certain documents, testimony, and cross-examination related to a dismissed criminal charge against Ms. Smith.  We denied respondent's motion and at trial permitted cross-examination related to the dismissed criminal charge.  However, we base our findings regarding Ms. Smith's credibility solely on our observations of her as a witness and our review of certain exhibits and not on any testimony regarding the dismissed criminal charge.

[16]The SunAmerica IRA distribution check of $9,000 was deposited to the Washington Mutual account during the statement period of August 14 through September 12, 2008.  The Washington Mutual account had a balance of -$3 on August 14, 2008.  The first ING IRA distribution check of $9,000 was deposited to the Washington Mutual account during the statement period of November 15 through December 11, 2008.  The Washington Mutual account had a balance of -$1,000 on November 15, 2008.  Finally, the second ING IRA distribution check of $18,980 was deposited to the Washington Mutual account during the statement period of December 12, 2008, through January 14, 2009.  The Washington Mutual account had a balance of $2,087 on December 12, 2008.

B.     Parties' Arguments

Respondent takes a strict view of petitioner's obligation to report as income withdrawals from his IRA accounts. He argues that petitioner must report the withdrawals as taxable distributions because petitioner was the owner of the IRAs and was the person entitled to receive distributions from the IRAs. Respondent further argues that the IRA account withdrawals were deposited into the Washington Mutual account, which was jointly owned by petitioner and Ms. Smith, and were used in part to pay "family living expenses during the time petitioner and his wife resided together", medical expenses, and a family Verizon Wireless account. Respondent emphasizes that petitioner "never attempted to return the funds to the IRAs after he discovered the payments nor did he otherwise contest the distributions." Citing Priv. Ltr. Rul. 201119040 (May 13, 2011) as an example, respondent also states that, if IRA funds were stolen and the owner of the IRA received a refund of the stolen funds, the owner could deposit the refund into the IRA as a tax-free rollover. However, because petitioner took no steps to replenish his IRAs for the allegedly stolen amounts, respondent contends that petitioner must recognize income equal to the distribution amounts in 2008.

Petitioner contends that because the IRA withdrawals were made pursuant to forged withdrawal requests, the distribution checks were stolen, the signatures

on the distribution checks were forged, and he did not receive an economic benefit from the distributions, we should hold that he is not a payee or distributee within the meaning of section 408(d)(1).  Petitioner also contends that under Washington State law, no distribution occurred from either the SunAmerica IRA or the ING IRA because he did not authorize the IRA withdrawal requests or the endorsements on the IRA distribution checks.  Therefore, petitioner contends that as a matter of State law no amount was paid or distributed within the meaning of section 408(d)(1).[17]

We first address whether petitioner is a distributee within the meaning of section 408(d)(1) when he did not authorize the withdrawal requests, did not receive or endorse the IRA distribution checks, and did not receive an economic benefit from the distributions.  We then address whether petitioner is a distributee within the meaning of section 408(d)(1) because he allegedly benefited from the IRA distributions or because he failed to file a claim against ING or SunAmerica for an unauthorized payment.

---

[17]Because we hold that petitioner was not a payee or distributee within the meaning of sec. 408(d)(1), we need not address this contention.

C.      Whether Petitioner Is a Payee or Distributee Within the Meaning of Section 408(d)(1)

As an initial matter, respondent contends that petitioner must include in income the amounts withdrawn from his IRAs irrespective of State law and even though he did not consent to the distributions and was not aware that the distributions occurred. Respondent relies on our opinions in Bunney v. Commissioner, 114 T.C. at 262, and Vorwald v. Commissioner, T.C. Memo. 1997-15, to support his contentions.

In Bunney, we held that the distributee or payee of a distribution from an IRA is generally "'the participant or beneficiary who, under the plan, is entitled to receive the distribution.'" Bunney v. Commissioner, 114 T.C. at 262 (quoting Darby v. Commissioner, 97 T.C. at 58). However, we also rejected the Commissioner's argument in Bunney that the recipient of an IRA distribution is automatically the taxable distributee, noting that "in the context of a distribution from a pension plan the term 'distributee' is not necessarily synonymous with 'recipient.'" Id. (citing Estate of Machat v. Commissioner, T.C. Memo. 1998-154). We reject respondent's contention that petitioner, as the purported recipient of the IRA distributions, is automatically the taxable distributee under Bunney.

In Vorwald, we held that a distribution of funds from an IRA pursuant to a court-ordered garnishment resulted in a taxable distribution to the taxpayer. The garnishment was ordered to satisfy the taxpayer's child support obligation. The taxpayer in Vorwald did not consent to the distribution from his IRA and did not realize the distribution had occurred until he was notified of the distribution by the Commissioner. Nevertheless, we held that the distribution was income to the taxpayer because it discharged his legal child support obligation and was thus the equivalent of receipt by him.

The distributions from petitioner's IRAs were not court ordered and did not satisfy a legal obligation that petitioner owed to Ms. Smith or any other party. Instead, the distributions were unauthorized and completed without petitioner's knowledge. In addition, petitioner did not receive any benefit, directly or indirectly, from the distributions in 2008 as Ms. Smith used the funds from the unauthorized withdrawals to set up her postseparation household, take a vacation and a family trip, and pay expenses for which she was liable. Vorwald is distinguishable because the funds at issue in that case were legally obtained and were applied to a liability for which the taxpayer was personally liable. Because petitioner did not request, receive, or benefit from the IRA distributions, we

conclude that he was not a payee or distributee within the meaning of section 408(d)(1).

D.    <u>Whether Petitioner Is a Distributee or Payee on the Basis of Ratification or His Failure To Assert a Claim for an Unauthorized Payment</u>

Respondent further contends that petitioner had one year to discover and report the unauthorized signatures and that petitioner's failure to so report precludes any remedies under Washington law, thus making the distributions taxable to petitioner. In other words, according to respondent, State law would not require ING and SunAmerica to restore any amounts paid out of petitioner's IRA accounts since he did not report the unauthorized signatures within one year. Therefore, respondent contends that petitioner received a distribution within the meaning of section 408(d)(1).

Under Washington's version of the Uniform Commercial Code (U.C.C.), notwithstanding care or lack of care, for an account of an individual the individual must discover and report an unauthorized signature within one year. <u>See</u> Wash. Rev. Code Ann. sec. 62A.4-406(f) (West 2003). If the individual does not do so, he may not recover for the unauthorized signature. <u>Id.</u> But, even if Wash. Rev. Code Ann. sec. 62A.4-406(f) precludes a remedy to petitioner against ING and

SunAmerica, that does not mean that as of the end of 2008 petitioner had received a taxable distribution from his IRA accounts.[18]

Under respondent's analysis, petitioner acquiesced to the distributions by not making a claim under Washington law and by accepting the proposed settlement in his divorce, which the parties stipulated was "taken into account" in the decree of dissolution. Under Washington law, it appears petitioner could have made a claim to restore his IRA accounts within one year of the unauthorized withdrawals, but even if so, that right did not expire until sometime in 2009. Similarly, the decree of dissolution allocating property between petitioner and Ms. Smith was not entered until 2010. At best, under respondent's theory, petitioner did not ratify the IRA distributions until 2009 at the earliest. Accordingly, any failure by petitioner to exercise his rights under Washington law and any purported benefit he received in the divorce does not affect our conclusion that he was not a payee or distributee within the meaning of section 408(d)(1) in 2008, the year for which respondent determined the deficiency at issue.

On the basis of the foregoing, we hold that petitioner is not a distributee or payee within the meaning of section 408(d)(1) because the IRA distribution

---

[18]We express no opinion as to whether petitioner's failure to exercise available remedies under Washington law resulted in a constructive distribution from the IRA accounts in a later tax year.

requests were unauthorized, the endorsements on the checks that were issued pursuant to the requests were forged, he did not receive the economic benefit[19] of the IRA distributions, and the IRA distributions were not made to discharge any legal obligation of his. Accordingly, we conclude that petitioner did not fail to report any income attributable to distributions from his SunAmerica and ING IRAs in 2008.

III.    Section 72(t) Additional Tax

Section 72(t)(1) provides for a 10% additional tax on early distributions from qualified retirement plans, unless the distribution falls within a statutory exception. Because we hold that the withdrawals from petitioner's IRA accounts at SunAmerica and ING were not distributions taxable to him under section 408(d)(1) in 2008, he is not liable for the section 72(t) additional tax.

---

[19]Whether there is an economic benefit accruing to the taxpayer is the crucial factor in determining whether there is gross income. See, e.g., Afshar v. Commissioner, T.C. Memo. 1981-241 (citing James v. United States, 366 U.S. 213 (1961), Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955), and Rutkin v. United States, 343 U.S. 130 (1952)), aff'd without published opinion, 692 F.2d 751 (4th Cir. 1982).

IV.   <u>Filing Status</u>

Although petitioner does not discuss his filing status on brief and therefore could be deemed to have waived or abandoned that issue, <u>see</u> <u>Muhich v. Commissioner</u>, 238 F.3d 860, 864 n.10 (7th Cir. 2001), <u>aff'g</u> T.C. Memo 1999-192, we briefly explain why we sustain respondent's determination of petitioner's filing status.  The determination of whether an individual is married for purposes of determining filing status is made as of the close of the taxable year.  Sec. 7703(a)(1).  Under certain circumstances, a married taxpayer may be treated as unmarried if he or she lives apart from his or her spouse during the last six months of the taxable year.  <u>See</u> sec. 7703(b).

The parties agree that petitioner and Ms. Smith were still married on December 31, 2008, and that they were not separated for the last six months of the year.  Accordingly, the single filing status that Ms. Smith used in preparing petitioner's separately filed 2008 return was erroneous.  We find that petitioner's correct filing status for 2008 under these circumstances was married filing separately.

V.   <u>Accuracy-Related Penalty</u>

Respondent contends that petitioner is liable for the section 6662(a) penalty because petitioner's underpayment was attributable to a substantial understatement

of income tax.[20]  Section 6662(a) and (b)(1) and (2) authorizes the imposition of a 20% penalty on the portion of an underpayment that is attributable, among other things, to a substantial understatement of income tax or to negligence or disregard of rules or regulations.  A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  The term "understatement" means the excess of the amount required to be shown on the return for the taxable year over the amount of tax imposed that is shown on the return, reduced by any rebate.  Sec. 6662(d)(2)(A).  The amount of the understatement is reduced by that portion of the understatement that is attributable to (1) the tax treatment of any item if there is or was substantial authority for such treatment, or (2) any item if the relevant facts affecting the item's tax treatment are adequately disclosed in the

---

[20]For the first time on reply brief, respondent contends that petitioner alternatively is liable for a sec. 6662(a) penalty due to negligence.  Generally, we will not consider an issue that is raised for the first time on brief.  Estate of Aronson v. Commissioner, T.C. Memo. 2003-189 n.5 (citing Foil v. Commissioner, 92 T.C. 376, 418 (1989), aff'd, 920 F.2d 1196 (5th Cir. 1990)).  More importantly, by not raising the issue of negligence on opening brief, respondent has failed to provide petitioner with the opportunity to address this issue.  Respondent's attempt to first raise the issue of negligence as a basis for imposition of the sec. 6662 penalty on reply is untimely and prejudicial to petitioner.  See Kansky v. Commissioner, T.C. Memo. 2007-40.  We therefore do not consider it.

return or in a statement attached to the return and there is a reasonable basis for the taxpayer's treatment of the item. Sec. 6662(d)(2)(B).

The Commissioner bears the initial burden of production with respect to the taxpayer's liability for the section 6662 penalty. Sec. 7491(c). At trial the Commissioner must introduce sufficient evidence "indicating that it is appropriate to impose the relevant penalty." Higbee v. Commissioner, 116 T.C. at 446. Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. Id. at 446-447.

A taxpayer may avoid liability for the section 6662 penalty if the taxpayer demonstrates that the taxpayer had reasonable cause for the underpayment and that the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's efforts to assess his or her proper tax liability. Id.

We have found that petitioner is not liable for income tax in 2008 related to the payments from his SunAmerica IRA and his ING IRA. However, petitioner

conceded that he failed to report certain interest income and that he underreported wage income for 2008. Additionally, we have found that petitioner's proper filing status for 2008 is married filing separately. Although petitioner did not see his tax return before Ms. Smith filed it on his behalf and he did not sign it, he did not disavow the return, nor did he file a different return for 2008. Petitioner did not introduce any evidence to prove that he took affirmative steps to ensure the correctness of his tax liability; and he cannot rely on Ms. Smith, who is not a professional tax return preparer. See sec. 1.6664-4(c), Income Tax Regs. Petitioner has not produced evidence that he acted with reasonable cause and in good faith with respect to these underpayments. Accordingly, to the extent that the Rule 155 computations show that the understatement of tax exceeds the greater of 10% of the tax required to be shown on the return or $5,000, see sec. 6662(d)(1)(A), petitioner is liable for the section 6662(a) penalty for an underpayment of tax attributable to a substantial understatement of income tax.

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.