RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LONNIE W. HUBBARD,

*Petitioner-Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

> No. 24-1450

───────────────

Appeal from the United States Tax Court.
No. 4464-21—Alina I. Marshall, Judge.

Decided and Filed:  March 19, 2025

Before:  GIBBONS, LARSEN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Bruce R. Ellisen, Anthony T. Sheehan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  Lonnie W. Hubbard, Memphis, Tennessee, pro se.

───────────────

## OPINION

───────────────

MURPHY, Circuit Judge.  After a jury convicted Lonnie Hubbard of operating an illegal "pill mill," the government punished him in the expected ways.  The district court ordered Hubbard to serve decades in prison.  The government also confiscated his homes, vehicles, watercraft, and financial accounts using the criminal-forfeiture laws.  Years later, though, the Internal Revenue Service (IRS) sought to punish Hubbard in an unexpected way.  As part of the earlier forfeiture, the IRS had seized over $400,000 from Hubbard's individual retirement account (or IRA, in the vernacular of retirement planning).  The IRS suggested that the transfer

of this money into its own coffers qualified as "income" for Hubbard that he should have paid taxes on from prison. The tax court agreed and ordered Hubbard to pay over $180,000 in taxes and penalties.

We reverse. The tax court found that the transfer of the IRA funds qualified as Hubbard's income because it discharged an "obligation" that Hubbard owed. This conclusion misunderstood the type of forfeiture at issue. When courts impose a forfeiture, they can either grant the government ownership of a specific asset or enter a money judgment that allows the government to collect on any of the defendant's property. The forfeiture order in Hubbard's case granted the IRS ownership of his IRA; it did not enter a money judgment against him. So when the IRS withdrew the funds from the IRA, it was not taking Hubbard's money to discharge a debt. It was simply transferring its own money. The tax code provides that the "payee or distributee" of withdrawn IRA funds should pay these taxes. 26 U.S.C. § 408(d)(1). Because the IRS owned and controlled the IRA and received the funds, it qualified as the payee or distributee.

I

Hubbard, a pharmacist, owned and operated Rx Discount of Berea, PLLC, in eastern Kentucky. *See United States v. Hubbard*, 843 F. App'x 667, 669 (6th Cir. 2019) (order). This business proved lucrative. Hubbard used over $2 million of its income to pay for an extravagant lifestyle. *See id.* at 676. He owned two homes. He owned multiple Corvettes and a Mercedes, among other vehicles. And he owned a boat and jet skis. Hubbard also had his company establish an IRA on his behalf. The federal government did not tax Hubbard or his company on the funds put into this IRA, but Hubbard would have to pay taxes on any withdrawals that he made from the account. *See* 26 U.S.C. §§ 404(h), 408(d)(1), (e)(1). By 2017, the untaxed money in the IRA had grown to $427,518.

As it turns out, Hubbard generated this revenue illegally. He sold large amounts of oxycodone to those addicted to the drug. *See Hubbard*, 843 F. App'x at 672. And he supplied large amounts of pseudoephedrine to methamphetamine manufacturers. *See id.* at 673. The

government indicted Hubbard on drug and money-laundering offenses. *Id.* at 669. A jury convicted him of most offenses, and a district court sentenced him to 30 years in prison. *See id.*

As part of its criminal case against Hubbard, the government invoked the criminal-forfeiture laws. *See* 21 U.S.C. § 853; 18 U.S.C. § 982(a)(1). Its indictment alleged that Hubbard had used the proceeds from his crimes to pay for his homes, vehicles, and watercraft. The indictment also alleged that the money in Hubbard's financial accounts, including his IRA, represented proceeds from his crimes. So after Hubbard's convictions, the district court ordered the IRS to confiscate this property and money.

In 2017, the IRS seized the $427,518 in Hubbard's IRA. The agency treated this seizure as a taxable "distribution" to Hubbard. While confined in prison, though, Hubbard did not file a tax return for the 2017 tax year. In November 2020, the IRS sent him a notice of deficiency suggesting that he owed $274,979.91 for his failure to pay taxes in 2017. That total included three components: (1) $122,601 for the income taxes owed on the withdrawal in 2017; (2) $42,752 for the 10% penalty that arose because the IRA funds were withdrawn before Hubbard turned 59 and a half; and (3) $109,626.91 in interest and penalties because Hubbard failed to file a tax return and pay the required taxes on time.

Hubbard challenged this notice in the tax court. He argued that the claimed deficiency "should be paid by [the] feds" because his account "was forfeited to" them during his criminal case. Pet., App'x 62. The Commissioner of the IRS (whom we will call the "IRS" for short) conceded before the tax court that Hubbard should not have to pay either the 10% penalty for withdrawing the IRA funds early or a small part of the penalties. But the IRS otherwise moved for summary judgment on the remaining amounts.

The tax court granted its motion. *See Hubbard v. Comm'r*, T.C.M. (RIA) 2024-016, 2024 WL 450041, at *1 (2024). The court explained that its precedent had held that IRA funds qualify as income even when forfeited through an "involuntary distribution" to a third party. *Id.* at *3. And it held that this rule applied to Hubbard's IRA. *Id.* at *9. The court later issued an order finding that Hubbard owed $180,836.48 in taxes and penalties.

Hubbard appealed to this court.  *See* 26 U.S.C. § 7482(a)(1).  We review the tax court's decision de novo.  *See Whirlpool Fin. Corp. v. Comm'r*, 19 F.4th 944, 949 (6th Cir. 2021).

II

This case requires us to consider how the forfeiture laws interact with the tax laws.  We must first explain the forfeiture laws because the specific type of forfeiture matters to the tax question.  We will then explain why that forfeiture does not trigger tax obligations for Hubbard.

A

To help "ensure that crime does not pay," forfeiture laws have long allowed governments to seize property used in (or generated by) illegal activity.  *Kaley v. United States*, 571 U.S. 320, 323 (2014); *see Honeycutt v. United States*, 581 U.S. 443, 453–54 (2017); *Luis v. United States*, 578 U.S. 5, 19–20 (2016) (plurality opinion).  The English common law permitted the authorities to confiscate all of a convicted defendant's property, but "[t]hat harsh penalty never caught on in America."  *Luis*, 578 U.S. at 27 (Thomas, J., concurring in the judgment).  Instead, our laws have traditionally targeted only the "specific assets" that have a connection to the crime.  *Kaley*, 571 U.S. at 335 n.11; *see Honeycutt*, 581 U.S. at 448–49, 453.  The drug and money-laundering laws offer good examples of the required connections.  The money-laundering law allows the government to seek forfeiture of "any property, real or personal, involved in such offense, or any property traceable to such property."  18 U.S.C. § 982(a)(1).  And the drug laws allow the government to seek forfeiture of drug "proceeds," of "property" "derived from" those proceeds, and of "property" "used" "to commit" or "facilitate" a drug offense.  21 U.S.C. § 853(a)(1)–(2).

The circuit courts have recognized "two general types" of forfeitures.  3 Charles Alan Wright & Sarah N. Welling, *Federal Practice & Procedure* § 571, at 411 (5th ed. 2022); *see id.* § 573, at 425.  The first identifies the "specific property" that the defendant must relinquish. Fed. R. Crim. P. 32.2(b)(1)(A).  The government becomes the owner of this property at the time of a conviction.  *See Luis*, 578 U.S. at 16 (plurality opinion); *id.* at 43 (Kennedy, J., dissenting). Some forfeiture laws (like those for drug offenses) also incorporate a "relation back" doctrine that treats the government as having "[a]ll right, title, and interest" in the property as of the time that the defendant committed the forfeiture-triggering crime.  21 U.S.C. § 853(c); *see Caplin*

*& Drysdale, Chartered v. United States*, 491 U.S. 617, 627 (1989); *see also United States v. 92 Buena Vista Ave.*, 507 U.S. 111, 131–32 (1993) (Scalia, J., concurring in the judgment). In some respects, this type of forfeiture resembles an "in rem" judgment because it permits the government to seize only the identified "tainted property" (not the defendant's other property). *Honeycutt*, 581 U.S. at 453.

The second type of forfeiture allows courts to impose a "personal money judgment" identifying a sum that the defendant must pay. Fed. R. Crim. P. 32.2(b)(1)(A). Under this type of forfeiture, the court calculates the money that a defendant owes based on the value of the forfeitable property involved in the crimes. *See, e.g.*, *United States v. Bradley*, 969 F.3d 585, 588–89 (6th Cir. 2020); *United States v. Bikundi*, 926 F.3d 761, 792 (D.C. Cir. 2019) (per curiam); *see also* Wright & Welling, *supra*, § 573, at 425. The court may enter this judgment even if the government does not know the location of tainted property and, indeed, even if the defendant cannot pay. *See United States v. Hampton*, 732 F.3d 687, 692 (6th Cir. 2013). This type of forfeiture resembles an "in personam" judgment because the government may collect the debt from any of the defendant's current or future assets. *See United States v. Navarrete*, 667 F.3d 886, 887–88 (7th Cir. 2012).

Hubbard's criminal case involved the first (not the second) type of forfeiture judgment. The district court did not identify a lump-sum amount that Hubbard owed and that the IRS could collect on by seizing any of his assets. Rather, the court identified the specific property subject to forfeiture—including homes, cars, and financial accounts—and ordered the IRS to "seize" only these assets and "dispose of [them] in accordance with the law." Order, App'x 133–35. The order included Hubbard's IRA on the list of forfeited property. After the government gave notice to parties who might have an interest in the assets, the court later ordered that they "shall be forfeited to the United States and no right, title, or interest in the property shall exist in any other party." Order at 2, *United States v. Hubbard*, 5:15-cr-00104 (E.D. Ky. May 25, 2017). In other words, the government became the IRA's owner at this time.

B

1

What are the tax implications for this forfeiture? We start with the basics. The Sixteenth Amendment gives Congress the "power to lay and collect taxes on incomes, from whatever source derived," without the need to apportion the taxes among the States. U.S. Const. amend. XVI; *see Moore v. United States*, 602 U.S. 572, 583 (2024). Exercising its full constitutional authority, Congress has defined gross income as "all income from whatever source derived[.]" 26 U.S.C. § 61(a). The Supreme Court has interpreted this broad definition to cover "all economic gains" that the tax code does not "exempt[]" from taxation. *Comm'r v. Banks*, 543 U.S. 426, 433 (2005). Those gains come in many forms. *See Helvering v. Bruun*, 309 U.S. 461, 469 (1940). Of relevance here, the definition of income covers not just lawful gains but also unlawful ones. *See James v. United States*, 366 U.S. 213, 218–22 (1961) (plurality opinion).

Equally relevant, a party obtains income not just when the party receives a *benefit* but also when the party avoids a *burden*. *See Bruun*, 309 U.S. at 469; *United States v. Kirby Lumber Co.*, 284 U.S. 1, 3 (1931). A casebook tax case—*Old Colony Trust Co. v. Comm'r*, 279 U.S. 716 (1929)—demonstrates this point. In *Old Colony Trust*, a company paid the IRS the taxes that its president owed on his income. *See id.* at 719–20. The Court held that the payment of these taxes qualified as additional "income" on which the president must pay more taxes. *See id.* at 720, 729–31. The Court found it "immaterial" that the company paid the taxes "directly" to the IRS rather than to the president. *Id.* at 729. And the Court treated the "discharge" of the "obligation" (or debt) that the president owed the IRS as analogous to a "receipt" of the same sum of money. *Id.*

Since *Old Colony Trust*, courts have recognized that a "relief from a liability" can amount to taxable income. *Bruun*, 309 U.S. at 469; *see Guarantee Title & Tr. Co. v. Comm'r*, 313 F.2d 225, 228 (6th Cir. 1963); 1 *Mertens Law of Fed. Income Tax'n* § 5A:19, Westlaw (database updated Aug. 2024). The tax court has even applied this principle when the taxpayer does not voluntarily agree to the discharge of the obligation. So, for example, that court has held that a taxpayer had to pay taxes on the wages that a court garnished from his paycheck to reduce

his child-support debts. *See Chambers v. Comm'r*, 80 T.C.M. 73 (CCH), 2000 WL 979990, at *2 (2000), *aff'd*, 17 F. App'x 688 (9th Cir. 2001) (mem.).

Despite this broad definition, Congress has never made taxpayers pay taxes on everything that qualifies as income. Rather, it has defined "taxable income" as "gross income minus" its many statutory deductions. 26 U.S.C. § 63(a). This case concerns retirement-related deductions. To motivate taxpayers "to save for retirement," Congress granted tax deductions for money that employees (or employers) put into an IRA. *Clark v. Rameker*, 573 U.S. 122, 124 (2014). Employees can deduct from their gross income the income that they earmark for these accounts, *see* 26 U.S.C. §§ 62(a)(7), 219(a), and employers can deduct the funds that they add to the accounts on their employees' behalf, *see id.* §§ 62(a)(6), 404(a). That said, this benefit represents only a *deferral* of taxation—not an *exemption* from taxation. *See Rini v. Comm'r*, 1992 WL 34484, at *2 (6th Cir. Feb. 24, 1992) (per curiam). Although the tax code does not tax the principal or earnings in an IRA, *see* 26 U.S.C. § 408(e)(1), employees must pay taxes when they withdraw the funds from the IRA down the road, *id.* § 408(d)(1). In the tax code's words, "any amount paid or distributed out of an individual retirement plan shall be included in gross income by the payee or distributee, as the case may be, in the manner provided under section 72." *Id.* Section 72, in turn, restricts when and how employees may make these IRA withdrawals. If they withdraw the funds before they reach 59 and a half and they do not put the money to certain uses (such as educational expenses), the tax code imposes an additional 10% tax penalty on top of the usual income taxes owed on the withdrawn funds. *See id.* § 72(t)(1), (2)(A)(i), (2)(E).

2

These rules applied to Hubbard's IRA. He had his company create a specific type of IRA—a "simplified employee pension"—for himself. *Id.* § 408(k). The company also placed funds in this IRA and could take a deduction for those deposits in the relevant tax years. *See id.* § 404(h). These IRA deposits fell within the broad definition of income (economic gain) for Hubbard—even if the money came from illegal drug sales. *See Banks*, 543 U.S. at 433; *James*, 366 U.S. at 218 (plurality opinion). As long as the funds remained in the IRA, though, the income fell within the IRA deduction. *See* 26 U.S.C. § 408(e)(1). If Hubbard had later

withdrawn the funds, he would have then had to pay taxes on them at that time. *See id.* §§ 402(h)(3), 408(d)(1).

But that eventuality never occurred. To the contrary, Hubbard forfeited his IRA to the IRS under the district court's forfeiture order. The forfeiture laws made the *IRS*—not *Hubbard*—the owner of this IRA at the time of the order, and the agency gained the kind of control over this account that any normal owner would possess. *See Luis*, 578 U.S. at 16 (plurality opinion); *id.* at 43 (Kennedy, J., dissenting). Not only that, the forfeiture order triggered the relation-back doctrine, which meant that the IRS also had "[a]ll right, title, and interest" in the IRA as of the earlier time that Hubbard committed his crimes. 21 U.S.C. § 853(c). Exercising this ownership interest, the IRS liquidated the IRA and deposited the money in another government fund.

We fail to see why Hubbard must pay taxes on the IRS's choice to withdraw the funds given that he no longer owned or controlled the IRA. From a bird's-eye view, Hubbard obtained no "economic gains" (that is, income) when the IRS withdrew the IRA funds. *Banks*, 543 U.S. at 433. Most people would have described the earlier forfeiture of the IRA as an economic loss—not an economic gain. And the later withdrawal of funds also did not reduce any "indebtedness" that Hubbard owed the IRS. *Bruun*, 309 U.S. at 469. Since the forfeiture order merely transferred ownership of the IRA to the IRS, that order no more created a "debt" than did the forfeiture of Hubbard's homes and cars. And because Hubbard did not own the IRA at the time of the withdrawal, he did not receive (and had no right to receive) its funds. Just as "the difference between what is yours and what is mine" matters for the forfeiture laws, so too it should matter for the tax laws. *Luis*, 578 U.S. at 16 (plurality opinion). The IRA was not Hubbard's. He should no more have to pay taxes on its funds than a person randomly selected from the Kentucky voter rolls.

From a more granular level, the tax code says that "any amount paid or distributed out of an individual retirement plan shall be included in gross income by the *payee or distributee*, as the case may be[.]" 26 U.S.C. § 408(d)(1) (emphasis added); *see id.* § 402(h)(3). The code does not define the words "payee" or "distributee." *See Roberts v. Comm'r*, 141 T.C. 569, 577 (2013). Under their ordinary meaning, though, the IRS was the "payee or distributee" of the funds. 26

U.S.C. § 408(d)(1). Once the IRS became the owner of the IRA, the agency (not Hubbard) was the "[o]ne to whom money [was] paid or payable," and the agency (not Hubbard) was the "beneficiary entitled to payment." *Black's Law Dictionary* 488, 1150 (7th ed. 1999). To be sure, we agree with the tax court that the payee or distributee will presumptively be the named "participant or beneficiary who is eligible to receive funds from the IRA." *Roberts*, 141 T.C. at 576. But even that court has recognized that this presumption must give way when the facts so dictate. It thus has refused to treat the named participant as the payee or distributee when someone else fraudulently withdrew funds out of an IRA without the participant's knowledge. *See Balint v. Comm'r*, T.C.M. (RIA) 2023-118, 2023 WL 6209586, at *7–9 (2023); *Roberts*, 141 T.C. at 576–81. This case warrants the same result. When the IRS became the owner of Hubbard's IRA and took control of the account, the agency became the payee or distributee.

The IRS raises two counterarguments. It starts by trying to fit the withdrawal of the IRA funds within the broad definition of "income" in § 61(a). According to the agency, Hubbard received income under that definition because the funds relieved him of a debt. *See* Appellee's Br. 15–17; *Old Colony Trust*, 279 U.S. at 729. Admittedly, many cases from the tax court suggest that an IRA owner must pay taxes on the involuntary withdrawal of IRA funds even when the funds flow directly to a third party to satisfy the owner's debts. The tax court has applied this rule when a spouse garnished IRA funds to pay child support. *Vorwald v. Comm'r*, 73 T.C.M. (CCH) 1697, 1997 WL 5788, at *1–2 (1997). It has applied the rule when the IRS seized IRA funds to pay tax debts. *See Schroeder v. Comm'r*, 78 T.C.M. (CCH) 566, 1999 WL 797461, at *3 (1999); *Larotonda v. Comm'r*, 89 T.C. 287, 289–91 (1987). And it has applied the rule when prosecutors garnished IRA funds to pay a debt arising from a restitution award. *Rodrigues v. Comm'r*, 110 T.C.M. (CCH) 265, 2015 WL 5258767, at *5 (2015).

But the IRS's reliance on these cases overlooks the forfeiture here. If the district court in Hubbard's criminal case had entered a "personal money judgment" against Hubbard that was collectable on all his assets, that judgment may well have created a debt. Fed. R. Crim. P. 32.2(b)(1)(A); *see Navarrete*, 667 F.3d at 887–88. Perhaps in that event, the withdrawal of Hubbard's IRA funds might have created a tax obligation by reducing a debt that he owed the IRS. *Cf. Carione v. Comm'r*, 96 T.C.M. (CCH) 354, 2008 WL 4977327, at *4–6 (2008). Yet we

need not resolve that question because the district court did not enter such a judgment. Rather, it granted the IRS ownership of "specific property": the IRA. Fed. R. Crim. P. 32.2(b)(1)(A). The IRS thus did not withdraw the IRA funds to "discharge" an "obligation" that Hubbard owed the agency. *Old Colony Trust*, 279 U.S. at 729. The IRS withdrew those funds because it owned them and the forfeiture order told it to deposit them "into the Department of the Treasury Asset Forfeiture Fund[.]" Order at 3, *United States v. Hubbard*, 5:15-cr-00104 (E.D. Ky. May 25, 2017). Indeed, if the forfeiture order created a debt merely by transferring ownership of the IRA from Hubbard to the IRS, why wouldn't the order have created a debt in Hubbard's homes and cars too? Under the IRS's logic, Hubbard received "income" in the value of all items seized because all the seizures reduced his debts to the IRS. We do not read the word "income" in this unusual way.

Alternatively, the IRS argues that the withdrawal of the IRA funds qualified as a "recognition event" that triggered Hubbard's deferred duty to pay income taxes on those funds under the tax code's retirement provisions. Appellee's Br. 22–24. Yet the IRS does not even quote the statutory paragraph that matters on this question—let alone explain why Hubbard was a "payee or distributee" of the IRA funds. 26 U.S.C. § 408(d)(1). The agency instead argues that Hubbard should not be relieved of the tax obligations he would have incurred if he had withdrawn the IRA funds himself because that relief "would frustrate public policy by burdening the fisc with a portion of the forfeiture, thereby reducing its 'sting.'" Appellee's Br. 23 (quoting *Wood v. United States*, 863 F.2d 417, 422 (5th Cir. 1989)). This "unadorned appeal to public policy" misunderstands our role. *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 706 (2022). Congress must "make [the] policy judgments" about how much of a defendant's assets to forfeit and whether the defendant should pay taxes on the forfeited assets. *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 226 (2024). We must only "interpret and apply the law as we find it[.]" *Id.*

Indeed, once courts get into this policy-making business, they may never get out. For example, if public policy demands that Hubbard pay the taxes on the withdrawn funds, why shouldn't it demand that he pay the 10% early-distribution penalty because the IRS withdrew the funds before he turned 59 and a half? The IRS's notice of deficiency requested this amount. But

the agency abandoned that request before the tax court. Perhaps it recognized that the tax court had already refused to impose this penalty in another case about an "involuntary" IRA withdrawal. *See Larotonda*, 89 T.C. at 292. The tax court in that case found as a policy matter that taxpayers in this predicament should not have to pay the extra money because that "would be like throwing salt into a wound." *Id.* So has the IRS used one policy argument to force Hubbard to pay the taxes and another one to allow him to avoid the penalty? We are not as confident as the tax court that the tax code's text would allow taxpayers to avoid this early-distribution penalty if it otherwise required them to pay the underlying taxes. *See In re Kochell*, 804 F.2d 84, 84–87 (7th Cir. 1986). At day's end, though, we will set these policy arguments to the side. We "best" "effectuate Congress's nuanced policy judgments" by applying the tax code as written. *Summa Holds., Inc. v. Comm'r*, 848 F.3d 779, 788–89 (6th Cir. 2017). And again, the IRS has identified no text in that code that required Hubbard to pay the taxes on the forfeited IRA.

In any event, the Fifth Circuit case that the IRS cites for its policy argument does not support the agency. That case addressed a different situation: suppose a criminal defendant earns tainted income in the years that the defendant commits crimes. *See Wood*, 863 F.2d at 418. Suppose further that (unlike in Hubbard's case) no tax exemptions exist for the proceeds. Lastly, suppose that a court later finds the proceeds forfeitable, and its conclusion triggers a relation-back provision that grants title in the proceeds to the government at the earlier time of the crimes. *See* 21 U.S.C. § 853(c). Would the proceeds qualify as the defendant's "income" at that earlier time even if the relation-back doctrine meant that the money belonged to the government all along? The Fifth Circuit answered "yes" to this question. *See Wood*, 863 F.2d at 419. The court reasoned that "the test for taxable income is not title"; it "is actual dominion and control." *Id.* Applying that test, the court explained that the defendant "exercised complete dominion and control over the proceeds" in the earlier tax years. *Id.* The government, by comparison, "did not even know the proceeds existed" at that time. *Id.*; *see also Santilli v. Comm'r*, 69 T.C.M. (CCH) 2974, 1995 WL 367259, at *1–2 (1995); *Gambina v. Comm'r*, 91 T.C. 826, 828–29 (1988).

In this case, by contrast, Hubbard does not seek to avoid the taxes that he owed on the non-exempt income he earned while operating his criminal business. He thus does not rely on

the relation-back doctrine to avoid taxes on that pre-forfeiture income. Rather, he challenges taxes that he allegedly owes on income that the IRS generated through its actions after the forfeiture. At that time, Hubbard did not "exercise[] complete dominion and control" over the IRA. *Wood*, 863 F.2d at 419. Rather, the IRS controlled the IRA when it withdrew the funds. If anything, then, *Wood* confirms that Hubbard did not obtain "income" from that withdrawal. *Id.*

We reverse and remand for proceedings consistent with this opinion.