# United States Tax Court

T.C. Memo. 2023-41

DUNCAN BASS,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 833-20.                                  Filed March 27, 2023.

————————

Duncan Bass, pro se.

*Tammie A. Geier*, *Amy Dyar Seals*, *Olivia H. Rembach*, and *Ashley M. Bender*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, *Judge*: By statutory notice of deficiency dated December 30, 2019, the Internal Revenue Service (IRS or respondent) determined a deficiency in petitioner's federal income tax of $6,307 and an accuracy-related penalty of $1,261 pursuant to section 6662(a)[1] for the 2017 taxable year. In his Answer and his First Amendment to Answer respondent asserted increased deficiencies and proportionate increases in the penalty.[2]

————————

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

[2] As discussed *infra* pp. 7–8, in his Answer respondent asserted an increased deficiency of $11,057 and a proportionate increase in the penalty. On the basis of petitioner's testimony and certain other evidence stipulated by the parties at trial,

**[*2]** After certain concessions by petitioner, as discussed *infra* pp. 7–8, the issues remaining for decision for 2017 are whether petitioner (1) is entitled to deduct certain expenses he reported on his Schedule C, Profit or Loss From Business (Sole Proprietorship); (2) is entitled to deduct certain gifts to charity he reported on his Schedule A, Itemized Deductions; and (3) is liable for the accuracy-related penalty. With respect to these issues, we uphold in part the IRS' determinations (as modified by respondent's Answer and his First Amendment to Answer).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts, the Supplemental Stipulation of Facts, and the attached Exhibits are incorporated herein by this reference. Petitioner resided in North Carolina when he timely filed his Petition with the Court.

I.   *Petitioner and His For-Profit and Nonprofit Activities*

In 2017 petitioner held two "W–2 jobs": one at Hirschfeld Industries (Hirschfeld) in Colfax, North Carolina, and the other at Supreme Maintenance Organization (SMO) in Greensboro, North Carolina. He worked at Hirschfeld as a machine operator Monday through Thursday from 6 a.m. until 4:30 p.m., Friday from 6 a.m. until 2:30 p.m., Saturday from 6 a.m. until 11 a.m., and some Sundays. He worked at SMO in an unspecified position Monday through Friday from 6 p.m. until 9 p.m.

In addition to being a "W–2 wage earner" at Hirschfeld and SMO, petitioner owned and operated an unincorporated business called Bass & Co. Bass & Co. provided landscaping and janitorial services to residences and commercial businesses, respectively. Bass & Co. also held itself out as a used clothing store called Cheap Shop that petitioner operated out of a garage in his backyard. During 2017 Cheap Shop was

respondent thereafter pursuant to Rule 41(b) filed a Motion for Leave to File First Amendment to Answer (Rule 41(b) motion), and e-lodged a First Amendment to Answer. In the Rule 41(b) motion respondent sought leave to file a First Amendment to Answer reflecting a further increased deficiency and a further proportionate increase in the penalty so that the pleadings conform to the evidence presented at trial. Petitioner did not file a response to respondent's Rule 41(b) motion, despite our directing him to do so. We will grant respondent's Rule 41(b) motion in that respondent may assert a further increased deficiency and a further proportionate increase in the penalty, and the First Amendment to Answer will be filed as of the date of our Order granting the Rule 41(b) motion.

[*3] open on Fridays and Saturdays from April to September, and the used clothing it sold was that which petitioner could not otherwise donate to Goodwill or the Salvation Army because of its condition. Since at least 2017 petitioner, Bass & Co., and a nonprofit organization that petitioner owned and operated called Lend-A-Hand (as further discussed below) have maintained a single bank account at Summit Credit Union.[3]

During 2017 petitioner owned three vehicles: a 2000 Dodge truck, a 2000 Ford truck, and a 2007 Suzuki car. He used the 2000 Dodge truck in connection with Bass & Co. and for driving to and from Hirschfeld and SMO. To document the use of the 2000 Dodge truck petitioner kept a daily mileage log on which he handwrote the city of destination, the name of the destination, the business purpose, and the miles he drove to each destination.[4] However, on these logs he never recorded the addresses of any of his clients, and he never identified his residential clients by name but simply recorded "Residential." Additionally, on these logs he recorded the miles he drove to and from Hirschfeld and SMO, indicating "W–2" as the business purpose. Separate and apart from these logs petitioner handwrote on United States Postal Service (USPS) priority mail envelopes the odometer reading of the 2000 Dodge truck at the beginning of each month during 2017.

During 2017 petitioner also owned and operated Lend-A-Hand, a North Carolina nonprofit corporation that he organized on June 24, 2010. Lend-A-Hand collects clothes and gives them to disadvantaged individuals, including those who have recently gotten out of jail or prison. The "face" of Lend-A-Hand, however, was Passion Young. Ms. Young was responsible for collecting the clothes, and those individuals needing clothes would get in touch with her, not petitioner. To facilitate the collection of the clothes, petitioner would withdraw cash monthly from the Summit Credit Union account and give the cash to Ms. Young for her to acquire clothes. Her acquisitions were done online, but petitioner maintained no records of these acquisitions or how Ms. Young in fact used the cash he gave her. Additionally, on January 1, 2015, petitioner and Ms. Young executed a contract that was automatically renewable every year whereby Lend-A-Hand agreed to advertise for Bass & Co. (including Cheap Shop) and in return Bass & Co. agreed to purchase approximately $15,000 worth of clothes from Lend-A-Hand.

---

[3] Bass & Co. stopped operating as of approximately January 2019.

[4] Not all days in 2017 are reflected in these logs; some days are skipped or missing, and the record is silent as to why.

[*4] Petitioner similarly maintained no records of the advertising and purchases done pursuant to this purported business arrangement.[5]

During 2017 petitioner donated men's, women's, and children's clothing and various nonclothing items to Goodwill and the Salvation Army. He acquired these donated items at no charge as they had been given to him by Bass & Co.'s residential clients. He made 173 separate trips to Goodwill and the Salvation Army, often making multiple trips on the same day to avoid in his view the need to have the items appraised. For each trip, a Goodwill or Salvation Army worker as the case may be provided petitioner with a donation acknowledgment receipt, which he in turn filled out, listing the items donated and their fair market values. Petitioner's Goodwill receipts reflect donated items totaling $18,837, consisting of clothing totaling $13,852 and the following nonclothing items totaling $4,985: $1,845 for furniture, $1,640 for electronic equipment, $45 for household appliances, $600 for toys, $105 for everyday kitchenware, $120 for luggage, $255 for household linens, $75 for backpacks, $20 for pictures, $90 for school supplies, $65 for books, $100 for baby items, and $25 for golf clubs.[6] Petitioner's Salvation Army receipts reflect donated items totaling $11,779, consisting of clothing totaling $11,594 and the following nonclothing items totaling $185: $70 for furniture, $65 for toys, and $50 for everyday kitchenware.[7]

---

[5] We also note that petitioner signed the contract on behalf of the "First Party," which was listed as Lend-A-Hand, with the address of his storage unit at AFM Storage in Greensboro, North Carolina, in 2017, while Ms. Young signed the contract on behalf of the "Second Party," which was listed as Cheap Shop with the address of petitioner's address of record with the Court. The record is silent regarding these contract irregularities.

[6] On brief respondent requests a finding of fact that "[t]he donation receipts as to . . . Goodwill reflect petitioner claimed to have donated items of total value of $19,174.00 for tax year 2017, consisting of donations for clothing totaling $13,939.00 and for other miscellaneous household items totaling $5,235.00." We decline to make that proposed finding. Respondent's requested $19,174.00 is slightly higher because his underlying amounts are based on adding the handwritten "total" amount reflected at the bottom of each receipt (rather than adding each item's handwritten amount reflected on each receipt), and some of the receipts reflect a handwritten "total" amount that is incorrect. For example, one Goodwill receipt reflects a handwritten "total" amount of $227, but the individual items handwritten on that receipt are "Girls dresses (8) $64.00," "Jeans (8) $48.00," "Shirts (10) $30.00," "Pants (10) $30.00," and "Tennis shoes (7) 35.00," which total $207.00.

[7] On brief respondent requests a finding of fact that "[t]he donation receipts as to the Salvation Army reflect petitioner claimed to have donated items of total value

[*5] II.     *Petitioner's 2017 Federal Income Tax Return*

Petitioner timely filed (with the assistance of a paid preparer) a Form 1040, U.S. Individual Income Tax Return, for 2017 (2017 return). On the 2017 return petitioner reported wages from Hirschfeld and SMO totaling $97,888; taxable refunds, credits, or offsets of state and local income taxes of $4,547; and a $39,105 business loss from Bass & Co., which he detailed on a Schedule C attached to the 2017 return. He also attached to the 2017 return a Schedule A, claiming $26,750 of itemized deductions.

On the Schedule C petitioner reported no gross receipts or sales and total expenses of $39,105. The expenses consisted of $10,133 for car and truck expenses for driving the 2000 Dodge truck 18,940 miles; $1,875 for depreciation and section 179 expenses; $2,231 for other interest; $511 for office expenses; $2,601 for supplies; $1,111 for meals and entertainment expenses; $4,500 for utilities; and $16,143 for other expenses, consisting of $127 for postage, $1,417 for power tools, $12,317 for Lend-A-Hand, $1,442 for a cell phone, and $840 for a storage building, i.e., rental of a storage unit at AFM Storage in Greensboro, North Carolina.

On the Schedule A petitioner reported, among other items not relevant here, gifts to charity totaling $18,999, consisting of noncash charitable gifts and "carryover" charitable gifts.[8] The details of his noncash charitable gifts were shown on three Forms 8283, Noncash Charitable Contributions, attached to the 2017 return. One Form 8283 was for gifts to Goodwill, another was for gifts to the Salvation Army, and a third was for gifts to Lend-A-Hand. All information about these

---

of $11,823.00 for tax year 2017, consisting of donations for clothing totaling $11,608.00 and for other miscellaneous household items totaling $215.00." We decline to make that proposed finding. Like his amounts with respect to petitioner's alleged Goodwill donations, *see supra* note 6, respondent's amounts for petitioner's alleged Salvation Army donations are slightly higher because respondent's amounts are based on adding the handwritten "total" amount reflected at the bottom of each receipt (rather than adding each item's handwritten amount reflected on each receipt), and some of the receipts reflect a handwritten "total" amount that is incorrect. For example, one Salvation Army receipt reflects a handwritten "total" amount of $189, but the individual items handwritten on that receipt are "Girls Dresses (8) $80.00," "Shorts (5) $25.00," and "1-box Plates/silverware $50.00," which total $155.00.

[8] Petitioner reported noncash charitable gifts totaling $30,686 and carryover charitable gifts of $22,204, despite reporting gifts to charity totaling $18,899. The record is silent as to this discrepancy.

[*6] gifts was reported on the forms' Section B, "Donated Property Over $5,000 (Except Publicly Traded Securities)," which has four parts.

For the gifts to Goodwill, in Section B Part I, "Information on Donated Property," petitioner indicated that he had donated "VARIOUS" property in "Good used" condition having an "[a]ppraised fair market value" of $10,286, which he had purchased in January 2017 for $4,360. Parts II and III, "Taxpayer (Donation) Statement" and "Declaration of Appraiser," respectively, were left blank.[9] Part IV, "Donee Acknowledgement," indicated Goodwill's employer identification number and street address in Greensboro and that Goodwill had received the property in Part I on December 21, 2017.

For the gifts to the Salvation Army, in Section B Part I petitioner indicated that he had donated "VARIOUS" property in "Good used" condition having an "[a]ppraised fair market value" of $10,060, which he had purchased in January 2017 for $4,175. Parts II and III were left blank. Part IV indicated the Salvation Army's employer identification number and street address in Greensboro and that the Salvation Army had received the property in Part I on May 2, 2017.

For the gifts to Lend-A-Hand, in Section B Part I petitioner indicated that he had donated "VARIOUS" property in "Good used" condition having an "[a]ppraised fair market value" of $10,340, which he had purchased in January 2017 for $4,440. Parts II and III were left blank. Part IV indicated Lend-A-Hand's employer identification number and street address in Greensboro, which was the same street address as AFM Storage's, and that Lend-A-Hand had received the property in Part I on November 24, 2017.

Petitioner did not attach any appraisals to the 2017 return.

Ultimately on the 2017 return petitioner claimed a refund of $13,194, of which $12,434 was refunded to him on or about February 28, 2018, and $760 was offset against his federal income tax liability for 2015.

III. *Audit and Determination*

On May 24, 2019, the IRS selected the 2017 return for examination, and it processed the examination of this return employing

---

[9] Part II is for any item listed in Part I that the appraisal identifies as having a value of $500 or less.

[*7] its Correspondence Examination Automated Support (CEAS) software program.[10]  Petitioner failed to respond to the letters the IRS issued to him through the CEAS program.

Consequently, on December 30, 2019, the IRS through the CEAS program issued to petitioner a notice of deficiency in the form of a Letter 3219 SC/CG, determining that (1) petitioner's claimed Schedule C deductions for car and truck expenses of $10,133, meals and entertainment expenses of $1,111, and other expenses of $16,143 should be disallowed and (2) petitioner should be liable for an accuracy-related penalty of $1,261 because his resulting underpayment of tax was attributable to "(1) [n]egligence or disregard of rules or regulations; (2) [s]ubstantial understatement of income tax; (3) [s]ubstantial valuation misstatement (overstatement); [or] (4) [t]ransaction lacking economic substance."

IV.  *Tax Court Proceedings*

On January 13, 2020, petitioner petitioned this Court for redetermination of the deficiency and the penalty.  On March 6, respondent filed an Answer to the Petition.  In answering the Petition, and in support of an increased deficiency and a proportionate increase in the penalty for a substantial understatement of income tax, respondent alleged that petitioner's claimed Schedule A deduction for gifts to charity totaling $18,899 should be disallowed.  The record includes a memorandum prepared on March 2, 2020, by one of respondent's counsel in this case, requesting approval to assert the proportionate increase in the penalty and bearing the signature of her immediate supervisor (also one of respondent's counsel in this case), dated March 3, 2020, approving assertion of the proportionate increase in the penalty.

At trial held on May 5, 2021 (by way of stipulation or statement made on the record), and on brief petitioner made several concessions.  Petitioner now agrees that he is not entitled to a Schedule A deduction for the carryover charitable gifts and the gifts to Lend-A-Hand.  Petitioner also now agrees that he is not entitled to a Schedule C deduction for meals and entertainment expenses.  *See* § 262(a).  Finally,

---

[10] The record includes the CEAS case summary dated January 31, 2020, with respect to the examination of the 2017 return.

**[\*8]** petitioner agrees that he failed to report Schedule C income (i.e., petty cash) from Bass & Co. of $8,863.[11]

Respondent's First Amendment to Answer reflects a further increased deficiency and a further proportionate increase in the penalty on the basis of petitioner's trial testimony (and the parties' stipulation) regarding the unreported Schedule C income. *See supra* note 2.

## OPINION

I. *Burden of Proof*

As a preliminary matter we address who has the burden of proof with respect to the issues remaining in this case.

Ordinarily, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and, except for the burden of production in any court proceeding with respect to an individual taxpayer's liability for any "penalty, addition to tax, or additional amount," *see* § 7491(c), the taxpayer bears the burden of proving otherwise, *see* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Furthermore, tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. *Segel v. Commissioner*, 89 T.C. 816, 842 (1987). This burden requires the taxpayer to demonstrate that the deductions claimed are allowable pursuant to some statutory provision and to substantiate the expenses giving rise to the deductions claimed by maintaining and producing adequate records that enable the Commissioner to determine the taxpayer's correct liability. § 6001; *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

But when (as here) the Commissioner raises a new issue or an increase in the deficiency (including a proportionate increase in the penalty), he bears the burden of proof as to the new issue or the increased deficiency (including the proportionate increase in the penalty). Rule 142(a)(1); *Roberts v. Commissioner*, 141 T.C. 569, 575 (2013). Accordingly, as to (1) the increased deficiency stemming from respondent's denial of petitioner's claimed Schedule A deduction for the gifts to Goodwill and the Salvation Army as asserted in his Answer and

---

[11] At trial petitioner asserted that he had filed an amended 2017 return reporting the Schedule C income. The record does not support that assertion, and we decline to find it as a fact.

**[*9]** (2) the proportionate increases in the penalty as asserted in his Answer and his First Amendment to Answer, respondent has the burden of proof.[12]

II.    *Schedule C Deductions*

Section 162 allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  § 162(a); Treas. Reg. § 1.162-1(a).  A business expense is "ordinary" if it is "normal, usual, or customary" in the taxpayer's trade or business.  *See Deputy v. du Pont*, 308 U.S. 488, 495 (1940).  An expense is "necessary" if it is "appropriate and helpful" to the taxpayer's business, but it need not be absolutely essential. *Commissioner v. Tellier*, 383 U.S. 687, 689 (1966) (quoting *Welch v. Helvering*, 290 U.S. at 113).  A taxpayer may not deduct a personal, living, or family expense unless the Internal Revenue Code expressly provides otherwise.  § 262(a).  The determination of whether an expense satisfies the requirements of section 162 is a question of fact.  *Cloud v. Commissioner*, 97 T.C. 613, 618 (1991) (citing *Commissioner v. Heininger*, 320 U.S. 467, 473–75 (1943)).

As we indicated *supra* p. 8, the burden of substantiating expenses rests with the taxpayer.  To this end, under the *Cohan* rule, if the taxpayer establishes that an expense is deductible but is unable to substantiate the precise amount, the Court may estimate the amount of the deductible expense, bearing heavily against the taxpayer whose inexactitude is of his own making.  *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930); *see also Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985).  In order for the Court to estimate the amount of a

---

[12] We note that respondent retained the burden of proof as to (1) the increased deficiency stemming from his assertion in his Answer that petitioner is not entitled to a Schedule A deduction for carryover charitable gifts and gifts to Lend-A-Hand and (2) the further increased deficiency stemming from his assertion in his First Amendment to Answer that petitioner had unreported Schedule C income from Bass & Co.  But since petitioner now agrees that he is not entitled to these deductions and had this income, respondent has plainly met his burden regarding these items and accordingly these asserted income and deduction adjustments are sustained.

We also note that petitioner does not otherwise contend that the burden of proof as to any matter should shift to respondent under section 7491(a), nor has he established that the requirements for shifting the burden of proof under that section have been met.  Accordingly, except to the extent of the increase in the deficiency stemming from the denial of petitioner's claimed Schedule A deduction for the gifts to Goodwill and the Salvation Army, the burden of proof as to the tax deficiency remains on petitioner.  *See* § 7491(a)(2).

**[\*10]** deductible expense, the taxpayer must establish some basis upon which an estimate may be made. *Norgaard v. Commissioner*, 939 F.2d 874, 879 (9th Cir. 1991), *aff'g in part, rev'g in part* T.C. Memo. 1989-390; *Vanicek*, 85 T.C. at 742–43. Otherwise an allowance would amount to "unguided largesse." *Norgaard v. Commissioner*, 939 F.2d at 879 (quoting *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957)).

The *Cohan* rule, however, is superseded—that is, estimates are not permitted—for certain expenses specified in section 274, such as "listed property" (including passenger automobile) expenses.[13] §§ 274(d), 280F(d)(4)(A); Temp. Treas. Reg. § 1.274-5T(a) (flush language); *see Boyd v. Commissioner*, 122 T.C. 305, 320 (2004). Instead, these types of expenses are subject to strict substantiation rules. *Sanford v. Commissioner*, 50 T.C. 823, 827 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969); Temp. Treas. Reg. § 1.274-5T(a). These strict substantiation rules generally require the taxpayer to substantiate with adequate records or by sufficient evidence corroborating the taxpayer's own statement (1) the amount of the expense; (2) the time and place the expense was incurred; and (3) the business purpose of the expense. *Bass v. Commissioner*, T.C. Memo. 2018-19, at \*7 (first citing *Balyan v. Commissioner*, T.C. Memo. 2017-140, at \*7; and then citing Temp. Treas. Reg. § 1.274-5T(b)), *aff'd per curiam*, 738 F. App'x 178 (4th Cir. 2018). For "listed property" expenses, including passenger automobile expenses, in addition to the time such expenses were incurred and their business purpose, the taxpayer must establish the amount of business use and the total use of such property. *Id.* (first citing *Balyan*, T.C. Memo. 2017-140, at \*7–8; and then citing Temp. Treas. Reg. § 1.274-5T(b)(6)(i)(B)).

Substantiation by adequate records requires the taxpayer to maintain (1) an account book, diary, log, statement of expense, trip sheets, or similar record prepared contemporaneously with the expenditure and (2) documentary evidence, such as receipts or paid bills, which together prove each element of an expenditure. *Id.* at \*7–8 (first citing *Balyan*, T.C. Memo. 2017-140, at \*8; then citing Treas. Reg. § 1.274-5(c)(2)(iii); and then citing Temp. Treas. Reg. § 1.274-5T(c)(2)).

Petitioner continues to maintain that he should be allowed his claimed 2017 Schedule C deductions in the following categories: (1) car

---

[13] A taxpayer may deduct passenger automobile expenses by using either actual cost or the standard mileage rate, provided he substantiates the amount of business mileage and the time and purpose of each use. *See* Treas. Reg. § 1.274-5(j)(2); Rev. Proc. 2010-51, 2010-51 I.R.B. 883.

[*11] and truck expenses, (2) postage, (3) power tools, (4) cell phone, (5) Lend-A-Hand, and (6) storage building. Below we address each category in turn.

### A. *Car and Truck Expenses*

On his 2017 Schedule C petitioner claimed a deduction of $10,133 for car and truck expenses for driving the 2000 Dodge truck 18,940 miles. Contrary to what petitioner appears to believe, these expenses are subject to the strict substantiation rules of section 274(d) and thus they cannot be estimated.[14] In support of these expenses, petitioner kept a daily mileage log on which he handwrote the city of destination, the name of the destination, the business purpose, and the miles he drove to each destination.

Despite petitioner's best efforts to maintain a contemporaneous mileage log, we find there are critical inaccuracies with his logs that cause them to not meet the strict substantiation requirements of section 274(d). His logs reflect total mileage of 10,674, which would amount to a deduction of $5,711 (using the IRS standard mileage rate of $0.535 for 2017) if properly substantiated.[15] Petitioner, however, claimed a deduction of $10,133, an amount that accounts for 18,940 miles (also using that standard mileage rate). This total mileage of 18,940 is consistent with the starting and ending odometer reading of the 2000

---

[14] On brief petitioner asserts that the 2000 Dodge truck was modified with sideboards and, as a result, he is exempt from the strict substantiation requirements of section 274(d). *See* Treas. Reg. § 1.274-5(k)(7) (providing that section 274(d) does not apply to any truck or van "specially modified with the result that it is not likely to be used more than a de minimis amount for personal purposes"). However, petitioner's assertion is without merit as the record is devoid of any evidence that the 2000 Dodge truck had been modified. Furthermore, even if sideboards had been installed on the 2000 Dodge truck, we cannot conclude that such a modification would prevent more than de minimis use for personal purposes. Indeed, petitioner testified at trial that the 2000 Dodge truck was his "house, was . . . [his] kitchen. It was everything."

[15] On brief respondent asserts that "[p]etitioner's mileage logs reflect total mileage of 9,985 that would amount to a deduction in the amount of $5,342.00 if properly substantiated." Respondent's total mileage figure is slightly lower, and the record is unclear as to how respondent arrived at that figure. The total mileage of 10,674 reflected in the text above is based on adding each handwritten mileage entry on each mileage log "sheet." We note that like some of the receipts for petitioner's donations to Goodwill and the Salvation Army, some of the mileage log sheets reflect a handwritten "total" mileage figure that is incorrect. For example, one mileage log sheet reflects a handwritten "total" mileage figure of 114, but the individual handwritten mileage entries on that sheet are 7, 16, 29, 10, 27, 8, and 27, which total 124.

[*12] Dodge truck for 2017 which he noted on the first and last pages of his logs ("start 328449" and "end 347389") and the monthly odometer reading of the 2000 Dodge truck during 2017 which he noted on USPS priority mail envelopes. Thus, it is apparent that petitioner claimed a Schedule C deduction for car and truck expenses for *all* miles he drove the 2000 Dodge truck during 2017, making no adjustment whatsoever for personal mileage, including the numerous trips to and from (1) his "W–2 jobs" at Hirschfeld and SMO (which are reflected on his mileage logs), (2) the Salvation Army and Goodwill (which are not reflected on his mileage logs), and (3) various restaurants (which are also not reflected on his mileage logs).

Indeed, petitioner's mileage logs are identical in format and in the type of information recorded to his mileage logs with respect to his 2014 taxable year that the Court previously considered. Transcript, *Bass v. Commissioner*, No. 12871-17 (T.C. May 23, 2018) (bench opinion). In that case, in concluding that petitioner had failed to establish that he was entitled to a Schedule C deduction for car and truck expenses for driving the same 2000 Dodge truck but in connection with Bass & Co. for 2014, the Court noted that "Mr. Bass['s 2014 mileage logs] did not distinguish between non-deductible expenses of commuting to one's employment and deductible expenses of one's business." *Id.* at 11. Relying on *Freeman v. Commissioner*, T.C. Memo. 2009-213, the Court attempted to discern whether one could calculate the extent to which petitioner's driving in connection with Bass & Co. added to his commuting miles so that the excess would be deductible; however, because the logs had failed to provide "enough information about the locations, much less reliable information about the actual trips made," the Court was unable to identify any deductible mileage. *Id.* The same rings true for petitioner's mileage logs in the instant case—there is just not enough information recorded thereon about the destinations, much less reliable information about the actual trips made; so we, too, are unable to identify any deductible mileage that petitioner had in this case.

Accordingly, petitioner is not entitled to the deduction claimed on his 2017 Schedule C for car and truck expenses, and we sustain respondent's determination in this regard.

B. *Postage*

On his 2017 Schedule C petitioner claimed a deduction of $127 for postage. At trial he testified without specificity, merely referencing

[*13] several USPS receipts from 2017 and his 2017 bank records from Summit Credit Union in the record, that the postage related to his purchase of stamps and the cost of mailing letters and other documents to respondent's counsel and the Tax Court on various occasions in 2017.

If an expense is ordinary and necessary and relates to a taxpayer's personal tax liability, a deduction under section 212(3) is allowable. *Meersman v. Commissioner*, T.C. Memo. 1993-47, 1993 Tax Ct. Memo LEXIS 48, at *7–8 (citing *Sharples v. United States*, 209 Ct. Cl. 509 (1976)). On the basis of the record before us, we conclude that petitioner is entitled only to a Schedule C deduction for postage totaling $19.95. This is the total cost petitioner incurred to mail letters and other documents to respondent's counsel and the Tax Court in 2017, as reflected by three separate USPS receipts—one showing a $6.65 mailing to Holtsville, New York (where the IRS has an office), on September 24, 2017, and two $6.65 mailings to "Washington DC 20217" (where this Court is located) on June 18 and October 15, 2017; the rest of the postage items are personal expenses that are not deductible as the record is inadequate to show that these items were ordinary and necessary and related to petitioner's personal tax liability. *See* § 262(a).

Accordingly, we sustain in part respondent's determination with respect to the deduction claimed on petitioner's 2017 Schedule C for postage.

C. *Power Tools*

On his 2017 Schedule C petitioner claimed a deduction of $1,417 for power tools, which he asserts is for gasoline purchased for Bass & Co.'s landscaping equipment, such as a pressure washer, a weed eater, and lawn mowers. Referencing certain documentary evidence, i.e., gas station receipts spanning four months in 2017 totaling $496 and debit card entries on the 2017 bank records from Summit Credit Union, at trial petitioner testified that he estimated that he spent $26 or $27 per week for gasoline for the power tools in 2017. This testimony and documentary evidence are sufficient to substantiate that petitioner purchased gasoline in 2017; but, as even he acknowledged at trial, most of his debit card purchases for gasoline were for gasoline for the 2000 Dodge truck. Petitioner is therefore not entitled to the full amount of his claimed Schedule C deduction for power tools. However, on the basis of the record before us and pursuant to the *Cohan* rule, we conclude that he is entitled to a Schedule C deduction for power tools totaling $976 (i.e., the gas station receipts spanning four months in 2017 totaling $496

[*14] plus estimating conservatively that he spent $15 per week for 32 weeks (or eight months), which totals $480).

Accordingly, we sustain in part respondent's determination with respect to the deduction claimed on petitioner's 2017 Schedule C for power tools.

### D.    *Cell Phone*

On his 2017 Schedule C petitioner claimed a deduction of $1,442 for a cell phone. At trial petitioner credibly testified that he had one cell phone with services provided by Verizon Wireless that he used 50% of the time for personal purposes and 50% of the time for business purposes, which included speaking with Ms. Young daily about Cheap Shop's operations and receiving calls requesting Bass & Co.'s landscaping and janitorial services. Although petitioner did not produce any Verizon Wireless invoices or bills, bank records for 2017 from Summit Credit Union that are in the record show monthly recurring payments to Verizon Wireless. It appears that the amount petitioner claimed as a Schedule C deduction for cell phone was for his total cell phone usage. He is not entitled to the full amount, but on the basis of the record before us and pursuant to the *Cohan* rule, we conclude that he is entitled to 50% of that amount (i.e., the business portion of his cell phone usage as he testified), which is $721.

Accordingly, we sustain in part respondent's determination with respect to the deduction claimed on petitioner's 2017 Schedule C for a cell phone.

### E.    *Lend-A-Hand*

On his 2017 Schedule C petitioner claimed a deduction of $12,317 for Lend-A-Hand, which he asserts is for monthly cash payments to Lend-A-Hand to support its operations. At trial, however, petitioner offered testimony in this regard that was at best confusing and at worst contradictory. In one instance, he described the prevailing arrangement that resulted in this purported business expense as one where he would withdraw cash monthly from the Summit Credit Union account and give that cash to Ms. Young for her to purchase clothing online for Lend-A-Hand. In another instance, petitioner emphasized that the cash payments to Ms. Young were not made as charitable gifts relating to Lend-A-Hand but were made pursuant to a contract executed by petitioner and Ms. Young in 2015 and automatically renewable every year whereby Lend-A-Hand agreed to advertise for Bass & Co.

**[*15]** (including Cheap Shop) and in return Bass & Co. agreed to purchase approximately $15,000 worth of clothes from Lend-A-Hand. Petitioner neither produced any receipts or other records for the purported purchases of clothing by Ms. Young nor any receipts, invoices, or other records relating to the advertising and purchases done pursuant to the purported business arrangement. While petitioner's 2017 bank records from Summit Credit Union show regular ATM withdrawals of various amounts, these records (or any other evidence in the record) do not show how the withdrawn funds were used and more specifically that they were business payments from Bass & Co. to Lend-A-Hand.

Accordingly, petitioner is not entitled to the deduction claimed on his 2017 Schedule C for Lend-A-Hand in any amount, and we sustain respondent's determination in this regard.

F.    *Storage Building*

On his 2017 Schedule C petitioner claimed a deduction of $840 for a storage building, which he asserts is for rental of a storage unit at AFM Storage to store Bass & Co.'s equipment. At trial, however, petitioner offered only general and uncorroborated testimony to substantiate this expense. He did not produce any receipt or invoice for this expense, and the documentary evidence upon which he relies—a bank record for April 2017 from Summit Credit Union that shows a cleared check of $840—is woefully inadequate under section 162 standards.[16] This bank record does not indicate who the check was made out to and what it was for. The bank record is also particularly unavailing given the fact that petitioner, Bass & Co., and Lend-A-Hand maintained a single bank account at Summit Credit Union in 2017. Furthermore, the address of AFM Storage is the same address petitioner listed on his 2017 Form 8283 for Lend-A-Hand. These facts point instead to petitioner's attempting to deduct a Lend-A-Hand expense. And thus, on the basis of the record before us, the Court is also unable to make an estimate of the deductible expense for a storage building for 2017 under the *Cohan* rule.

---

[16] Petitioner appended to his answering brief a multiyear ledger/spreadsheet purportedly reflecting a payment of $840 for the AFM Storage unit on March 31, 2017. At trial petitioner did not proffer this document to be admitted into evidence, and thus it is not part of the evidentiary record. *See Podlucky v. Commissioner*, T.C. Memo. 2022-45, at *10 n.4; *Belanger v. Commissioner*, T.C. Memo. 2019-1, at *5–6, *aff'd*, 776 F. App'x 877 (5th Cir. 2019); *Sandberg v. Commissioner*, T.C. Memo. 2011-72, slip op. at 9.

[*16] Accordingly, petitioner is not entitled to the deduction claimed on his 2017 Schedule C for a storage building in any amount, and we sustain respondent's determination in this regard.

III. *Schedule A Deduction for Noncash Charitable Contributions*

A taxpayer is allowed as a deduction any charitable contribution made during the taxable year. § 170(a)(1). A charitable contribution is defined as "a contribution or gift to or for the use of" a charitable organization. § 170(c). Such a deduction is allowable "only if verified under regulations prescribed by the Secretary." § 170(a); *see* Treas. Reg. § 1.170A-13. As relevant here, the verification requirements are different for contributions of $250 or more, of more than $500, and of more than $5,000. § 170(f)(8), (11)(B) and (C). For any contribution of $250 or more the donor must obtain a "contemporary written acknowledgment" from the charitable organization. § 170(f)(8); *Campbell v. Commissioner*, T.C. Memo. 2020-41, at *16; *see also* Treas. Reg. § 1.170A-13(f)(1). For any noncash charitable contribution exceeding $500, the donor must (1) include with the income tax return for the year the deduction is claimed a description of the property contributed (and such other information as the Secretary may require) and (2) maintain records containing certain information (as required by Treasury Regulation § 1.170A-13(b)(3)(i)). Treas. Reg. § 1.170A-13(b)(2)(ii); *see also* § 170(f)(11)(B). For any noncash charitable contribution exceeding $5,000, the donor is required to (1) obtain a "qualified appraisal" for the property contributed, (2) attach a fully completed "appraisal summary" to the income tax return for the year the deduction is claimed, and (3) maintain records containing certain information (as required by Treasuary Regulation § 1.170A-13(b)(2)(ii)). Treas. Reg. § 1.170A-13(c)(2); *see also* § 170(f)(11)(C); *Campbell*, T.C. Memo. 2020-41, at *16. Additionally, and as relevant here, for purposes of determining the $500 and $5,000 thresholds, property and all "similar items of property" donated to one or more charitable organizations is treated as one property. § 170(f)(11)(F); Treas. Reg. § 1.170A-13(c)(1)(i). The phrase "similar items of property" is defined as "property of the same generic category or type, such as . . . lithographs, paintings, photographs, books, . . . clothing, jewelry, furniture, electronic equipment, household appliances, toys, [and] everyday kitchenware." Treas. Reg. § 1.170A-13(c)(7)(iii).

On his 2017 Schedule A petitioner claimed a deduction in pertinent part for noncash charitable gifts to Goodwill and the Salvation Army, and respondent, in his Answer and in support of an increased

[*17] deficiency and a corresponding increase in the penalty for a substantial understatement of income tax, alleged inter alia that this deduction should be disallowed.

The details of petitioner's noncash charitable gifts to Goodwill and the Salvation Army were shown on two Forms 8283—one for each charitable organization—attached to the 2017 return. All information about these gifts was reported only in Section B for "Donated Property Over $5,000 (Except Publicly Traded Securities)" on the forms. In that section on each form petitioner indicated that he had donated "VARIOUS" property in "Good used" condition; for the gifts to Goodwill he indicated that the property had an "[a]ppraised fair market value" of $10,286; and for the gifts to the Salvation Army he indicated that the property had an "[a]ppraised fair market value" of $10,060. By his own reporting, petitioner was required to have obtained a qualified appraisal for the "VARIOUS" property and attached to the 2017 return two fully completed appraisal summaries for the "VARIOUS" property pursuant to section 170(f)(11)(C) and Treasuary Regulation § 1.170A-13(c)(2). *See also* Treas. Reg. § 1.170A-13(c)(7)(iii). He did not.

Relying on the fact that he made 173 separate trips to Goodwill and the Salvation Army and received a donation acknowledgment receipt for each trip (all of which are in the record), at trial petitioner testified that because the donated items reflected on each receipt had a fair market value of less than $250, he did not need to have any of the items appraised. Petitioner, however, misapprehends the applicable law. As indicated *supra* p. 16, for purposes of determining the $5,000 threshold and accordingly whether the "appraisal" requirements are applicable, section 170(f)(11)(F) and Treasuary Regulation § 1.170A-13(c)(1)(i) mandate aggregating similar items of property donated to one or more charitable organizations. Petitioner's Goodwill and Salvation Army receipts reflect donations of men's, women's, and children's clothing, as well as various nonclothing items. Pursuant to section 170(f)(11)(F) and Treasuary Regualtion § 1.170A-13(c)(1)(i), all the clothing donations must be aggregated. The aggregate of these donations is $25,446 (i.e., $13,852 (the total amount of the clothing donations to Goodwill) plus $11,594 (the total amount of the clothing donations to the Salvation Army)), which is over five times the $5,000 threshold and thus necessitates that they be appraised. Since there was no such appraisal, petitioner is not entitled to the deductions claimed on his 2017 Schedule A for noncash charitable gifts of clothing to Goodwill and the Salvation Army.

[*18] Regarding petitioner's donation of nonclothing items to Goodwill and the Salvation Army, the Goodwill receipts reflect donations of various nonclothing items—furniture totaling $1,845, electronic equipment totaling $1,640, household appliances totaling $45, toys totaling $600, everyday kitchenware totaling $105, luggage totaling $120, household linens for $255, backpacks totaling $75, pictures totaling $20, school supplies totaling $90, books totaling $65, baby items totaling $100, and golf clubs for $25; and the Salvation Army receipts likewise reflect donations of various nonclothing items—furniture totaling $70, toys totaling $65, and everyday kitchenware totaling $50. The similar items of property here are merely the furniture, toys, and everyday kitchenware, requiring that they be separately aggregated; the rest of the items do not need to be aggregated at all. Separate aggregation of the aforementioned items does not, however, result in any of those items' being over the $5,000 threshold and thus necessitating that they be appraised. The furniture and the toys are over the $500 threshold though; and on the basis of the record before us, we conclude that petitioner is entitled to the deduction claimed on his 2017 Schedule A for noncash charitable gifts of those items to Goodwill and the Salvation Army. Also on the basis of the record before us, we conclude that petitioner is entitled to the deduction claimed on his 2017 Schedule A for noncash charitable gifts of the remaining nonclothing items to Goodwill and the Salvation Army.

Accordingly, we sustain in part respondent's determination with respect to the deduction claimed on petitioner's Schedule A for noncash charitable gifts to Goodwill and the Salvation Army.

IV.   *Accuracy-Related Penalty*

We now address whether petitioner is liable for the section 6662(a) accuracy-related penalty.

Various grounds for the imposition of this penalty are set forth in the notice of deficiency issued to petitioner although only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one ground. Treas. Reg. § 1.6662-2(c). We need address only respondent's claim that petitioner is liable for the section 6662(a) accuracy-related penalty on the ground that petitioner's underpayment

**[\*19]** of tax for 2017 was attributable to a substantial understatement of income tax under section 6662(b)(2).[17]

For purposes of section 6662(b)(2), an understatement generally means the excess of the amount of tax required to be reported on the return over the amount shown on the return. § 6662(d)(2)(A). An understatement is substantial in the case of an individual if the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for that taxable year or $5,000. § 6662(d)(1)(A).

As indicated *supra* pp. 8–9, respondent bears the burden of production with respect to the accuracy-related penalty, requiring him to come forward with sufficient evidence establishing that it is appropriate to impose this penalty. *See* § 7491(c); *Higbee*, 116 T.C. at 446. Additionally, this initial burden of production under section 7491(c) includes producing evidence that the procedural requirements of section 6751(b) have been met; to wit, that the initial determination of the accuracy-related penalty has been "personally approved (in writing) by the immediate supervisor of the individual making such determination," § 6751(b)(1), except that supervisory approval is not required where the penalty is "automatically calculated through electronic means," § 6751(b)(2); *see Walquist v. Commissioner*, 152 T.C. 61, 68–69 (2019).

Once respondent meets his burden of production, the burden of proof is upon petitioner, *see Higbee*, 116 T.C. at 449, except for the increased portions of the penalty asserted by respondent in his Answer and his First Amendment to Answer; respondent bears the burden of proof as to those portions, *see Arnold v. Commissioner*, T.C. Memo. 2003-259, slip op. at 11. Petitioner's burden of proof requires him to prove that there was reasonable cause for the portion of the underpayment reflected in the December 30, 2019, notice of deficiency and that he acted in good faith with respect to that portion. *See* § 6664(c)(1); *Higbee*, 116 T.C. at 446–47. Respondent's burden of proof requires that he prove the contrary, i.e., that the additional underpayments reflected in his Answer and First Amendment to Answer were not due to reasonable cause and petitioner did not act in good faith with respect to those portions. *See* § 6664(c)(1); *Higbee*, 116 T.C. at 446–47; *see also Full-Circle Staffing,*

---

[17] Additionally, we note that in his Answer and his First Amendment to Answer respondent claims proportionate increases in the penalty for a substantial understatement of income tax only.

[*20] *LLC v. Commissioner*, T.C. Memo. 2018-66, at *43*, aff'd in part, appeal dismissed in part*, 832 F. App'x 854 (5th Cir. 2020).

Although a Rule 155 computation is necessary here, it is apparent, taking into consideration both the Court's holdings herein and petitioner's concessions, that petitioner has an understatement of income tax for 2017 that exceeds the greater of 10% of the tax that was required to be shown on the 2017 return or $5,000. Accordingly, respondent has met his initial burden of production, showing that petitioner's understatement of income tax for 2017 was substantial.

Turning to the rest of respondent's initial burden of production (i.e., whether he has provided sufficient evidence showing that the procedural requirements of section 6751(b) have been met), the record establishes that the penalty initially asserted against petitioner in the December 30, 2019, notice of deficiency was "automatically calculated through electronic means." *See* § 6751(b)(2)(B). As such it is excepted from the written supervisory approval requirement of section 6751(b)(1) and thus respondent has no burden of production as to the approval of the initial penalty assertion. *See Walquist*, 152 T.C. at 73.

Regarding the proportionate increase in the penalty that respondent asserts in his Answer, the record establishes that he has complied with section 6751(b)(1) and thus has met the rest of his initial burden of production as to this proportionate increase in the penalty. However, regarding the proportionate increase in the penalty that respondent asserts in his First Amendment to Answer, the record does not establish that he has complied with section 6751(b)(1) and thus has not met the rest of his initial burden of production as to this proportionate increase in the penalty.[18]

---

[18] As indicated *supra* note 2, respondent's First Amendment to Answer is filed as of the date of our Order granting his Rule 41(b) motion. Respondent, though, appended several "Exhibits" to the Rule 41(b) motion; to wit, an Exhibit whose purpose is to show compliance with the section 6751(b) procedural requirements for the further increased penalty, consisting of two emails dated May 4, 2021—one from one of respondent's counsel in this case requesting approval from her immediate supervisor to assert the further increased penalty and the other from that immediate supervisor approving assertion of the further increased penalty. The evidentiary record in this case was closed on May 5, 2021, when the case was submitted at the conclusion of the trial. Absent a motion to reopen the record, a party may not interject new or additional evidence into the record as attachments to pleadings or briefs. *See Podlucky*, T.C. Memo. 2022-45, at *10 n.4; *Belanger*, T.C. Memo. 2019-1, at *5–6; *Sandberg*, T.C. Memo. 2011-72, slip op. at 9. As respondent has not filed a motion to reopen the record,

**[\*21]** Petitioner must then establish that he had reasonable cause and acted in good faith in order to prevail as to the portion of the penalty for which he bears the burden of proof. At trial although petitioner appeared sincere and his sophistication regarding federal income tax matters is rather limited, he failed to present persuasive evidence of reasonable cause and acting in good faith. Respondent, in turn, also failed to introduce any evidence establishing to the contrary, i.e., that petitioner did not have reasonable cause and act in good faith.

Accordingly, we sustain respondent's determination regarding the accuracy-related penalty as reflected in the December 30, 2019, notice of deficiency, but we do not sustain respondent's determination regarding the proportionate increases in the accuracy-related penalty as reflected in his Answer and his First Amendment to Answer.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*An appropriate order will be issued, and decision will be entered under Rule 155.*

---

none of the Exhibits appended to the Rule 41(b) motion are evidence and accordingly they have not been considered by the Court as such when preparing this Opinion. *See Podlucky*, T.C. Memo. 2022-45, at \*10 n.4; *Belanger*, T.C. Memo. 2019-1, at \*5–6; *Sandberg*, T.C. Memo. 2011-72, slip op. at 9.